**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SERGEANTS BENEVOLENT ASSOCIATION HEALTH & WELFARE FUND, on behalf of itself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ACTAVIS ELIZABETH, LLC, BRECKENRIDGE PHARMACEUTICAL, INC., HERITAGE PHARMACEUTICALS INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., UDL LABORATORIES, INC., PAR PHARMACEUTICAL, INC., PLIVA, INC., TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., QUALITEST PHARMACEUTICALS, INC., and UPSHER-SMITH LABORATORIES, INC., | |
| Defendants. | |

Plaintiff Sergeants Benevolent Association Health & Welfare Fund, on behalf of itself

and all others similarly situated, brings this Class Action Complaint against Defendants Actavis

Elizabeth, LLC; Teva Pharmaceuticals USA, Inc.; Teva Pharmaceutical Industries Ltd.; Pliva,

Inc.; Mylan Inc.; Mylan Pharmaceuticals Inc.; UDL Laboratories, Inc.; Par Pharmaceutical, Inc.;

Qualitest Pharmaceuticals, Inc.; Heritage Pharmaceuticals Inc.; Breckenridge Pharmaceutical,

Inc.; and Upsher- Smith Laboratories, Inc.(collectively, the "Defendants")[1] and alleges as follows:

## I.     NATURE OF THE ACTION

1.      This case arises out of an anticompetitive conspiracy among Defendants to raise and fix the prices of the primary formulations of generic propranolol hydrochloride tablets and capsules (collectively, "Propranolol").  A beta-blocker drug on the World Health Organization's List of Essential Medicines, Propranolol is used to treat chest pain, control heart rhythm, prevent migraines, reduce shaking or tremors, treat heart and circulatory conditions, and help with thyroid and adrenal gland conditions.  Generic versions of Propranolol have been available in the United States since the 1980s.

2.      Plaintiff brings this civil antitrust action on behalf of a proposed class of end-payors who indirectly purchased, reimbursed, or otherwise paid for: (1) Propranolol capsules during the period between February 20, 2013 and the present (the "Propranolol Capsule Class Period"); and (2) Propranolol tablets during the period from February 9, 2015 to the present (the "Propranolol Tablet Class Period").

3.       Following generic pharmaceutical trade association meetings in October 2012 and February 2013 attended by Actavis, Mylan, Upsher-Smith, and Breckenridge, the Capsule Defendants raised the price of Propranolol capsules by a dramatic margin.  These price increases occurred at around the same time and were the result of Defendants' horizontal price-fixing agreement.

4.      Beginning in March 2013, Actavis, Breckenridge, Mylan, and Upsher-Smith implemented significant price increases for Propranolol capsules.  The average price of

---

[1] Actavis, Mylan, Upsher Smith, and Breckenridge are referred to as the "Capsule Defendants"; Mylan, Qualitest, Par, Teva, Pliva, and Heritage are referred to as the "Tablet Defendants."

Propranolol capsules increased by up to 80% between March and November 2013. Between March 2013 and July 2014, prices for Propranolol capsules increased over 300%.  Prices remain at supracompetitive levels today—Propranolol capsules cost approximately 240% more than they did prior to the February 2013 generic pharmaceutical meeting.

5.      Similarly, prices for Propranolol tablets remained stable until shortly after a meeting of generic pharmaceutical manufacturers in February 2015 attended by Mylan, Teva, Par, Qualitest, and Heritage.  Beginning in February 2015, the average prices for Propranolol tablets increased dramatically.  Between March 11, 2015 and March 18, 2015, Propranolol tablet prices increased by an average of over 300%.  By September 23, 2015, all manufacturers of Propranolol tablets had raised their prices by 860% from the previously-stable prices.  As is the case with Propranolol capsules, the Tablet Defendants' pricing has remained at supracompetitive levels. As of January 7, 2017, Propranolol tablets cost approximately 730% more than they did prior to the February 2015 generic pharmaceutical meeting attended by the Tablet Defendants.

6.      Defendants' extraordinary price increases were coordinated.  These increases were neither the product of a competitive market, nor made necessary by any increased manufacturing costs.  Likewise, Defendants' price increases were not the result of drug shortages.  And because generic pharmaceutical manufacturers do not incur the research and development costs that brand manufacturers invest to develop new prescription drugs, Defendants' price increases cannot be attributed to the need to fund research and development. Defendants' price increases resulted from their conspiracy to restrain trade in the market for Propranolol.

7.      The pricing practices of Defendants and others in the generic drug industry are the subject of intense regulatory scrutiny.  The Department of Justice recently unsealed criminal

informations against two former executives of Defendant Heritage for antitrust violations arising from a conspiracy to fix prices, rig bids, and allocate customers for two generic drugs. The DOJ is engaged in an ongoing investigation of anticompetitive conduct in the generic pharmaceutical market.

8.     In December 2016, 20 states' attorneys general filed a civil action for antitrust violations against Defendants Heritage, Teva, Mylan and other sellers of certain generic drugs (the "State AG Action"). The State AG Action alleges that the defendants engaged in anticompetitive conduct by allocating customers and market share; communicating directly concerning price; and agreeing to raise generic drug prices.

9.     To date, the DOJ has issued subpoenas to Defendants Actavis, Par, Teva and Mylan in connection with its ongoing investigation of anticompetitive practices in the generic pharmaceutical industry, which reportedly covers more than 12 companies and at least 24 drugs. In a regulatory filing with the SEC on November 9, 2016, Mylan additionally disclosed that one of its subsidiaries "as well as certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic . . . Propranolol products and any communications about such products. Related search warrants also were executed." The subpoenas follow a number of press reports and inquiries from the United States Congress highlighting the rising prices of generic drugs.

10.     Defendants' coordinated anticompetitive conduct was designed to and did raise, fix, maintain, or stabilize the price of Propranolol. As a result, Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the various state antitrust and consumer protection laws enumerated below. Plaintiff seeks damages and injunctive relief to prevent

Defendants from continuing and maintaining the anticompetitive combination, conspiracy, or agreements alleged in this complaint.

## II.   <u>JURISDICTION AND VENUE</u>

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 26.  This Court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which there are over 100 members of the Class (as defined herein); the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and at least one member of the Class is a citizen of a state different from that of one of the Defendants.  This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district under 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391 because Defendants transact business in this District and a substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have and will continue to have substantial effects in this District.

13.     This Court has personal jurisdiction over each Defendant because, among other things, each Defendant, directly or through its directors, officers, employees, representatives, agents, and/or affiliates: (a) transacted business throughout the United States, including in this judicial district; (b) sold Propranolol throughout the United States, including in this judicial district; (c) had substantial contacts with the United States, including in this judicial district; and (d) engaged in an illegal conspiracy to fix Propranolol prices that was directed at and had the intended effect of injuring persons located in the United States, including in this judicial district.

### III.   PARTIES

#### A.   Plaintiff

14.     Sergeants Benevolent Association Health & Welfare Fund ("SBA Fund") is located in New York and was established for the purpose of providing benefits to approximately 4,700 active and 7,600 retired New York City Police Department Sergeants and their dependents. As a third-party payor of pharmaceutical claims for its members, the SBA Fund is an indirect purchaser of Propranolol and was therefore injured as a result of Defendants' unlawful behavior. The SBA Fund has purchased and/or provided reimbursement for both Propranolol capsules and Propranolol tablets during the Class period, including in Arizona, California, Florida, Georgia, Illinois, Kansas, Maine, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Texas, Utah, Vermont, and Virginia.  For the past several years, the SBA Fund has continually purchased and/or provided reimbursement for Propranolol capsules and Propranolol tablets and will continue to do so.

#### B.   Defendants

15.     Defendant Actavis Elizabeth, LLC ("Actavis") is a Delaware limited liability company headquartered in Elizabeth, New Jersey.  During the Propranolol Capsules Class Period, Actavis marketed and sold Propranolol capsules in this District and throughout the United States.

16.     Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business in Fairfield, New Jersey.  During the Propranolol Capsules Class Period, Breckenridge marketed and sold Propranolol capsules in this District and throughout the United States.

17.     Defendant Qualitest Pharmaceuticals, Inc. ("Qualitest") is an Alabama corporation with its principal place of business in Huntsville, Alabama.  In 2010, Endo International PLC

("Endo International")—an Irish corporation with its principal place of business in Dublin, Ireland—acquired Qualitest for $1.2 billion.  During the Propranolol Tablets Class Period, Qualitest marketed and sold Propranolol tablets in this District and throughout the United States.

18.     Defendant Par Pharmaceutical, Inc. ("Par") is a Delaware corporation with its principal place of business in Woodcliff Lake, New Jersey.  In September 2016, Endo International acquired Par.  Endo then combined its Par and Qualitest business units, and renamed the combined business "Par Pharmaceutical, an Endo International Company."

19.     Defendants Qualitest and Par are referred to collectively as "Par."

20.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a subsidiary of Emcure Pharmaceuticals Ltd., based in Pune, India.  During the Propranolol Tablets Class Period, Heritage marketed and sold Propranolol tablets in this District and throughout the United States.

21.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.  Mylan is a subsidiary of Mylan N.V., a Netherlands corporation headquartered in Hartfordshire, U.K., and in Canonsburg, Pennsylvania.  During the Class Periods, Mylan Inc. marketed and sold Propranolol in this District and throughout the United States through its subsidiaries, Mylan Pharmaceuticals Inc. and UDL Laboratories, Inc.

22.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia 26505. During the Class Periods, Mylan Pharmaceuticals Inc. marketed and sold Propranolol in this District and throughout the United States.

23.     Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois. UDL is and was a subsidiary of Mylan Inc.

during the Class Period.  During the Propranolol Tablets Class Period, UDL marketed and sold Propranolol tablets in this District and throughout the United States.

24.     Defendants Mylan Inc., Mylan Pharmaceuticals Inc., and UDL are referred to collectively as "Mylan." Mylan maintains an office in this District.

25.     Defendant Teva Pharmaceutical Industries Ltd. is an Israeli company with its principal place of business in Petah Tikva, Israel.  Defendant Teva Pharmaceuticals USA, Inc.— a wholly owned subsidiary of Teva Israel—is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  During the Propranolol Tablets Class Period, Teva marketed and sold Propranolol tablets in this District and throughout United States.

26.     Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. Pliva is a subsidiary of Teva Pharmaceutical Industries, Ltd.  During the Propranolol Tablets Class Period, Pliva sold Propranolol tablets in this District and throughout the United States.

27.     Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., and Pliva, Inc. are referred to collectively as "Teva."

28.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business in Maple Grove, Minnesota.  During the Propranolol Capsules Class Period, Upsher-Smith marketed and sold Propranolol capsules in this District and throughout the United States.

## IV.    CO-CONSPIRATORS AND AGENTS

29.     The anticompetitive and unlawful acts alleged against the Defendants in this complaint were authorized, ordered, or performed by Defendants and their respective directors,

officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' business or affairs.

30.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged in this complaint and may have performed acts and made statements in furtherance of such violations.

31.     Each Defendant acted as the principal, agent or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged in this complaint.

32.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged in this complaint were consensually formed between the Defendant principals and agents.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals.  Defendants' agents acted under the explicit, implied, or apparent authority of their principals.  These acts include subsidiaries selling, distributing, or shipping Propranolol at the request of their parent companies.  Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals. Defendants' agents performed their duties within the scope of their agency, in selling, distributing, or shipping Propranolol that was sold at supracompetitive prices.

33.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

**V.     INTERSTATE AND INTRASTATE COMMERCE**

34.     At all relevant times, Defendants, directly or through one or more of their respective parents, subsidiaries, business units, agents or affiliates, promoted, distributed, sold or

delivered substantial amounts of Propranolol in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

35.     At all relevant times, Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Propranolol.

36.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

37.     Propranolol manufactured abroad by the Defendants or their affiliates and sold in the United States constitutes domestic or import commerce.

38.     In furtherance of their efforts to restrain competition in the market for Propranolol, Defendants employed the United States and interstate and international telephone lines, as well as means of interstate and/or international travel.  The activities of Defendants were within the flow of and have substantially affected interstate commerce.

39.     Defendants' anticompetitive conduct has had substantial intrastate effects in that, among other things, such conduct deprived retailers within each state of access to more affordable Propranolol that they could sell to end-payors within each state.  Defendants' anticompetitive combination, conspiracy, or agreement to reduce competition in the market for Propranolol has directly affected and disrupted commerce for end-payors within each state.

40.     During the relevant time period, Propranolol was shipped into each state and was sold to or paid for by end-payors.  Defendants' conduct as alleged herein has had substantial effects on intrastate commerce in each state because Propranolol was sold to consumers and

third-party payors in each state and Defendants entered into an unlawful, anticompetitive agreement that affected commerce in each state.

## VI.     FACTUAL ALLEGATIONS

### A.     Background Regarding Generic Prescription Drugs

41.     Bringing a new drug to market is both expensive and time consuming. Accordingly, subject to certain conditions, pharmaceutical manufacturers that invest in research and development and successfully develop and bring to market a new drug are by law granted a period of exclusivity during which they can market and sell the new drug without the threat of competitors offering the same product at lower prices.  The exclusivity period is designed to promote a balance between new drug innovation and generic drug competition.

42.     Under the Federal Food, Drug, and Cosmetic Act, a manufacturer that creates a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA").  An NDA must include specific data concerning safety and effectiveness, among other things.

43.     Once the FDA approves a brand manufacturer's NDA, the brand manufacturer may list the patents identified by the brand manufacturer in "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."  In the United States it takes an average of over 10 years to bring a new drug to market.

44.     The process for bringing a generic drug to market, by contrast, is faster and cheaper.  The Hatch-Waxman Act of 1984 lowered the regulatory hurdles for prospective generic drug manufacturers by simplifying and streamlining the NDA process.  A generic manufacturer seeking approval to sell a generic version of a branded drug may instead file an abbreviated new drug application or "ANDA."  An ANDA may rely on the scientific findings of safety and

effectiveness included in the brand manufacturer's original NDA, and must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug. Thus, an ANDA must show that the generic drug is therapeutically equivalent to the branded drug. In addition, as part of the FDA's ANDA approval process, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book.

45.    Generic drugs that are therapeutically equivalent to corresponding branded drugs receive an "AB" rating from the FDA, allowing their substitution for the branded drug when an end-payor presents a prescription for the branded drug.

46.    Congress enacted the Hatch-Waxman Act to accelerate the market entry of generic competitors to reduce health care expenses across the country. The expedited approval process and exclusivity periods established under Hatch-Waxman were designed to provide consumers with faster, cheaper access to bioequivalent generics while maintaining incentives to innovate in new drug development.

47.    Generic drug products provide the only form of direct economic and price competition for brand-name drugs. Absent the ability of purchasers to choose a therapeutically equivalent AB-rated generic alternative, branded drugs face no competition and can therefore be priced at much higher levels. In short, the presence of AB-rated generic drugs promotes a competitive market for essential prescription drugs.

48.    Ordinarily, a generic medication enters the market at a price 10% to 25% below the brand-name price. The price of the generic medication quickly and continually declines as other generic manufacturers enter the product market, until competitive pricing prevails.

Eventually, competition among manufacturers of a generic drug causes prices to approach manufacturers' marginal costs, resulting in significant savings to end-payors.

      **B.**    **Propranolol Price Increases**

49.    Propranolol is the generic version of the brand drug Inderal, a beta-blocker approved by the U.S. Food and Drug Administration in 1967.

50.    Beta-blockers regulate the flow of blood through the heart and the circulatory system and can be used to treat chest pain, hypertension, heart rhythm disorders, and other heart or circulatory conditions, as well as conditions affecting the adrenal system.

51.    Propranolol is one of the most frequently prescribed beta-blockers in the United States.

52.    In October 2012 and February 2013, each of the Capsule Defendants attended at least one of two meetings of the Generic Pharmaceutical Association ("GPhA")—the October 1-3, 2012 Technical Conference in Bethesda, Maryland, or the February 20-22, 2013 Annual Meeting in Orlando, Florida.

53.    The GPhA is a trade association for participants in the generic drug industry, including distributors, manufacturers, and suppliers of other goods and services.  The GPhA was formed in 2000 after the merger of three other generic drug trade associations—the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

54.    A number of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods:

      a.    **2012 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Government and Public Affairs for Teva; Doug Boothe, President and CEO of Actavis; and Jeffrey Glazer, CEO of Heritage;

b. **2013 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Global Government Affairs and Public Policy for Teva; Jeffrey Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis;

c. **2014 Board of Directors**: Jeffrey Glazer, CEO of Heritage; Tony Mauro, President of Mylan North America; and Allan Oberman, President and CEO of Teva Americas Generics;

d. **2015 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Jeff Glazer, CEO of Heritage; Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals; and

e. **2016 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Heather Bresch, CEO of Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

55. GPhA's October 2012 and February 2013 meetings are two of many opportunities the Capsule Defendants had to collude and fix prices for Propranolol capsules.

56. Shortly after the February 2013 GPhA meeting, the prices for Propranolol capsules increased substantially.

57. The average price of Propranolol capsules increased by up to 80% between March and November 2013. By July 23, 2014, the average price of Propranolol capsules sold by the Capsule Defendants had increased by more than 300% as compared to February 2013 levels. The following graph[2] shows that Defendants abruptly increased their Propranolol capsule prices

---

[2] The graph tracks pricing beginning on October 4, 2012 because National Average Drug Acquisition Cost ("NADAC") data for Propranolol capsules is unavailable prior to that date.

in tandem following the February 2013 GPhA meeting, and that since that time Defendants have continued to charge supracompetitive prices. The graph also demonstrates that, prior to the February 2013 GPhA meeting, Propranolol capsule prices were relatively stable.



58. Mylan, Teva, Par, Qualitest, and Heritage attended another GPhA Annual Meeting in Miami, Florida on February 9-11, 2015.

59. Within weeks of the 2015 GPhA Annual Meeting, the average prices of Propranolol tablets increased dramatically. In one month, between February 18 and March 18, 2015, Propranolol tablet prices had increased 300%. By September 23, 2015, the average price of Propranolol tablets increased by more than 870%. Between 2015 and 2016, certain dosages of Propranolol tablets increased over 1,000%.

60. The price increases for Propranolol tablets continue to the present, with Defendants continuing to act in concert to maintain supracompetitive several times higher than they were prior to February 18, 2015.

61.    The following graph[3] demonstrates the previously stable average price of

Propranolol tablets increased by approximately 730% between February 2015 and the present.



62.    Defendants' price increases were not necessitated by increased manufacturing

costs.  Nor were the price increases incurred to defray research and development costs.  Rather,

through their anticompetitive agreement to increase and maintain the price of Propranolol,

Defendants were able to substantially increase their revenues without having made investments

in research, development, or other costs associated with bringing branded Propranolol to market.

---

[3] The graph tracks pricing beginning on October 4, 2012 because NADAC data for Propranolol tablets is unavailable prior to that date.

C. **Factors Corroborating Defendants' Horizontal Price-Fixing Agreement**

63.     In addition to the pricing data set forth above, several market and other relevant factors support the conclusion that Defendants acted to unlawfully raise and fix Propranolol prices far above competitive levels.  The market for Propranolol in the United States is characterized by several factors that facilitated Defendants' conspiracy in restraint of trade, including: (1) market concentration among a limited number of participants; (2) high barriers to entry; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand and lack of available substitutes; and (5) ease of information sharing among Defendants.

1.     **Market Concentration**

64.     Market concentration facilitates collusion among participants.  If many companies sell the same product, companies that are not part of the conspiracy can erode cartel members' market shares by offering products at lower, more competitive prices, undercutting the cartel.

65.     The market for both formulations of Propranolol is highly concentrated. Together, Defendants Mylan, Teva, and Heritage control nearly the entire market for Propranolol tablets. Similarly, Defendants Actavis, Mylan, Upsher-Smith, and Breckenridge control nearly the entire market for Propranolol capsules.

66.     Given the lack of competing manufacturers of Propranolol, Defendants' concerted actions have had the ability to affect and have affected pricing in the United States.

2.     **High Barriers to Entry**

67.     Markets characterized by high barriers to entry are susceptible to anticompetitive price manipulation.

68.     Here, high barriers to entry in the market for generic drugs such as manufacturing costs, the need to conduct clinical testing, and regulatory oversight have prevented entry by

Propranolol manufacturers even though artificially high prices would normally attract market entrants.

69.     Despite the streamlining effect of the Hatch-Waxman Act, bringing a generic drug to market remains a costly and time consuming undertaking.  Through clinical testing, generic drug manufacturers are required to demonstrate to the FDA that their drug is bioequivalent to a reference listed drug.

70.     As a result of the substantial barriers to entry present in the generic drug market, it currently takes a median of 48 months for a generic drug to be approved.

71.     Economies of scale among incumbent generic manufacturers also render it difficult for new firms to enter the generic pharmaceutical market.  It is difficult for a new company to attempt to produce the same drug as larger, established firms—like Defendants— that already have well-established manufacturing infrastructures, distribution networks, and suppliers.

### 3.     Mutual Interchangeability of Defendants' Products

72.     When products offered by different firms are viewed by purchasers as interchangeable, the suppliers can more easily agree on a single price for the product in question, and effectively monitor pricing to enforce their agreement.  Thus, when a product is a commodity that is interchangeable with other products, conditions are ripe for an anticompetitive cartel.

73.     Generic drugs are by their nature interchangeable.  In order to obtain FDA approval as a generic drug, each manufacturer must show that the generic drug is bioequivalent to the branded drug.  In other words, the generic drug and branded drug must have the same active ingredient and perform in the same manner.   Each of the Propranolol products

manufactured by Defendants is a chemical compound composed of the same raw materials as the competing manufacturers' products. As such, the Propranolol products manufactured by Defendants are interchangeable and reasonable substitutes for one another.

### 4. Inelastic Demand

74. Where demand for a product is inelastic, increases in price cause only limited declines in the quantity of the product sold or consumed in the market. If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.

75. For a cartel to profit from raising prices above competitive levels, demand must be inelastic such that cartel members are able to raise prices without triggering a decline in demand that would render the concerted price increase unprofitable. Demand is most likely to be inelastic where a product is necessary and other products are not substitutes. Both of these conditions are met with respect to Propranolol.

76. Propranolol is an important and medically necessary drug for millions of people. Left untreated, certain heart and circulatory conditions normally treated by Propranolol can rapidly worsen and result in hospitalization, acute pain and discomfort, or death. Therefore, physicians and their patients regard Propranolol as a medical necessity that must be purchased without regard to an increase in price. While other beta-blockers on the market seek to treat similar conditions, Propranolol is often the only effective medicine that is reasonably available or medically suitable to patients.

77. Propranolol is also differentiated from other drug products because of its regulatory status. A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the brand name version and other generic versions of that drug. Defendants'

Propranolol products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar drug products.  A patient prescribed Propranolol could not, therefore, purchase a different drug using his or her Propranolol prescription, regardless of the respective prices of the drugs.

78.     Propranolol is thus susceptible to collusive price fixing as price increases will directly translate into more revenue for cartel members, rather than less.

### 5.     Ease of Information Sharing Among Defendants

79.     As described above, Defendants are members of the GPhA.  The Capsule Defendants all attended either or both of the October 1-3 2012 Technical Conference in Bethesda Maryland and the February 20-22, 2013 Annual meeting in Orlando Florida.  The Tablet Defendants (and/or their corporate parents) attended the 2015 GPhA Annual Meeting in Miami, Florida between February 9 and 11, 2015.  These meetings provided additional "networking events," which presented opportunities for collusion through informal, off-premises events, such as golf tournaments, fly-fishing outings, and kayaking trips.

80.     As part of its years-long investigation into anticompetitive pricing activities among generic drug manufacturers, the DOJ is investigating trade associations like the GPhA for creating opportunities for collusion among different generic manufacturers.  The DOJ has stated that trade associations are "one potential avenue for facilitating the collusion between salespeople at different generic producers."  Such conferences provide opportunities to interact with competitors at various professional and social events and provide an opportunity to discuss and share pricing information, upcoming bids, specific drug markets, pricing strategies, and other sensitive information.

81.     In this case, Defendants' common membership in GPhA provided them with opportunities to collude by sharing competitive information and collaborating on market strategies with regard to their Propranolol products.

82.     Defendants also had opportunities to collude through their involvement in the National Association of Chain Drug Stores ("NACDS").  According to its website, the NACDS is a trade organization whose mission "is to advance the interests and objectives of the chain community pharmacy industry by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

83.     Membership in the NACDS is open to generic pharmaceutical manufacturers, and Defendants Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith were NACDS members from 2013 through 2016.  Members have access to custom industry research and industry publications, can participate in NACDS committees and workgroups, and attend various conferences.

84.     On April 20-23, 2013, NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" attended by "senior management" in the pharmaceutical retailing and manufacturing industries.  Attendees are provided a list of participating companies in advance, and have access to private meeting rooms where executives can meet face-to-face.  And attendees can choose from a variety of business programs, "invitation only" events, and social functions.  The following of Defendants' representatives, among others, attended NACDS's 2013 Annual Meeting:

    a.   **Actavis:** Paul Bisaro, Board Member; Andrew Boyer, President and CEO of North America Generics; Michael Reed, Executive Director of Trade Relations;

Michael Baker, Executive VP of Trade Sales and Development; Paul Reed, Sr. Director of Trade Sales and Development; and Robert Stewart, Chief Operating Officer;

b. **Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Robert Potter, Sr. VP of North America National Accounts and Channel Development; Jeffrey May, VP of North America Product Strategy; and Jim Nesta, VP of Sales;

c. **Par:** Paul Campanelli, President; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Sr. Advisor for Generic Sales;

d. **Teva:** Jeremy Levin, President and CEO; Allan Oberman, President and CEO of Teva Americas Generics; Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Teri Coward, Sr. Director Sales and Trade Relations; Michael Sine, Director, Corporate Account Group; Jonathan Kafer, Executive VP, Sales and Marketing; David Marshall, VP of Operations; Dave Rekenthaler, VP of Sales; and

e. **Upsher-Smith:** Mark Evenstad, CEO; Thomas Burke, Chief Operating Officer; Brad Leonard, Sr. Director of National Accounts; Scott Hussey, Sr. VP of Sales; Jim Maahs, VP of Commercial Portfolio Management; and Mike McBride, VP of Partner Relations.

85.     The next year, executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS 2014 Annual Meeting held on April 26-29 at The Phoenician resort in Scottsdale, Arizona.

86.     Executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Mylan, Par, Teva, and Upsher-Smith also attended the NACDS 2015 Annual Meeting held on April 25-28 at The Breakers resort in Palm Beach, Florida.

87.     On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The Total Store Expo provides pharmaceutical industry executives with opportunities to meet with each other and to "[f]ollow up on key discussions that were initiated during the NACDS Annual Meeting."  The following of Defendants' representatives, among others, attended the NACDS's 2013 Total Store Expo:

a.  **Actavis:** Andrew Boyer, President and CEO North America Generics; Anthony Giannone, Executive Director of Sales; Michael Reed, Executive Director of Trade Relations; Paul Reed, Sr. Director of Trade Sales and Development; Michael Baker, Executive VP of Trade Sales and Development; John Shane, Director of Trade Relations; Maureen Meehan, Director of National Accounts; Cindy Stevens, Director of National Accounts; Michael Dorsey, Director of National Accounts; Nancy Baran, Director of Customer Relations; Kathleen Conlon, Director of Contract Administration; Marc Falkin, Sr. VP of Sales; Napoleon Clark, VP of Marketing; Megan Gorman, Sr. Marketing Manager; and Rob Hooper, Sr. Marketing Manager;

b.  **Breckenridge:** Benjamin Hall, CEO; Larry Lapila, President; Phil Goldstein, National Accounts Sales Director; Joan Lyle, Director of National Accounts; Scott Cohon, National Director of Sales; Dave Nielsen, Director of Sales; Sonia De La Rosa, Director of Business Development; Jim McManimie, Sr. VP of Sales; and Martin Schatz, Sr. VP of Sales;

c. **Heritage:** Jeffrey Glazer, Chairman and CEO; Jason Malek, President; Allen Dunehew, President and CEO; Anne Sather, National Account Manager; Neal O'Mara, National Account Manager; and Matthew Edelson, Sr. Director of Sales;

d. **Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer; Matt Cestra, Sr. Director of Marketing; Martin Fletcher, Sr. Director of Commercial Business and Purchasing; Rodney Emerson, Director of Pricing and Contracts; Kevin McElfresh, Executive Director of National Accounts; Mike Aigner, Director of National Accounts; Edgar Escoto, Director of National Accounts; Lance Wyatt, Director of National Accounts; John Baranick, Director of Trade Relations; Robert Potter, Sr. VP North American National Accounts and Channel Development; Heather Paton, VP of Sales for Mylan Institutional; Robert Potter, Sr. VP of North America National Accounts and Channel Development; Jeffrey May, VP of North America Product Strategy; and Jim Nesta, VP of Sales; and Rob O'Neill, Head of Generic Sales;

e. **Par:** Paul Campanelli, President; Gerald Burton, VP of National Accounts; Karen O'Connor, VP of National Accounts; Rick Guillory, VP of National Accounts; Jon Holden, VP of Sales; Michael Altamuro, VP of Marketing and Business Analytics; Christine Caronna, Director of National Accounts; and Renee Kenney, Sr. Advisor for Generic Sales; and

f. **Upsher-Smith:** Brad Leonard, Sr. Director of National Accounts; Dave Zitnak, National Accounts Sr. Director of Trade; Doug Zitnak, National Accounts Sr. Director of Trade; Chad Olson, Director, Generic Products; Carol Weeklund, Associate Director, Marketing Operations; Scott Hussey, Sr. VP of Sales; Mike

McBride, VP of Partner Relations; Jim Maahs, VP, Commercial Portfolio

Management; JoAnn Gaio, Sr. National Account Manager; Michael Muzetras, Sr.

National Account Manager; Beth Pannier, Sr. National Account Manager; and

Mary Rotunno, National Account Manager.

88.     Executives, senior management, and salespeople from Defendants Actavis,

Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS Total Store

Expo on August 23-26, 2014, at the Boston Convention Center in Massachusetts, as well as the

Total Store Expo on August 22-25, 2015 at the Colorado Convention Center in Denver.

89.     In addition to common membership in the GPhA and the NACDS, Defendants are

involved in an array of buyer-side industry groups, through which they can share pricing

strategies, bid terms, and other competitively sensitive information.  For instance, the Minnesota

Multistate Contracting Alliance for Pharmacy ("MMCAP") is a group purchasing organization

operated and managed by the State of Minnesota's Department of Administration.  According to

its website, "MMCAP member facilities purchase over $1 billion per year and have national

account status with all of the major brand name and generic pharmaceutical manufacturers."

Several of the Defendants are vendors for the MMCAP.

90.     In 2014, the following Defendant representatives served as vendors for the

MMCAP: Mark Blitman, Executive Director of Sales for Government Markets for Actavis; Scott

Cohon, National Director of Sales for Breckenridge; Anne Sather, National Account Manager for

Heritage; Jan Bell, Director of National Accounts for Mylan; Nick Gerebi, Director of National

Accounts for Teva; and Michelle Brassington, Regional Account Manager for Upsher-Smith.

Defendants have a continuing relationship with the MMCAP, and several of these individuals

served as vendors again in 2016.

91.     The Health Care Supply Chain Association is a trade association that represents group purchasing organizations, such as the MMCAP.  The Health Care Supply Chain Association hosts events that Defendants attend, at which they have the opportunity to interact with each other and discuss their respective businesses and customers.  For example, executives from both Actavis and Teva participated in the LogiPharma Supply Chain Conference on September 16-18, 2014 in Princeton, New Jersey.

92.     The Health Care Supply Chain Association also hosted the National Pharmacy Forum on February 16-18, 2015, in Tampa, Florida, where the following representatives of Defendants were present:

   a.   **Actavis:** John Fallon, Executive Director of Sales;

   b.   **Breckenridge:** David Giering, Marketing and Trade Relations Manager;

   c.   **Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Jan Bell, Director of National Accounts; Heather Paton, VP of Institutional Sales; Mark Pittenger, Sr. Director of National Accounts; and

   d.   **Teva:** Nick Gerebi, Director of National Accounts; Jeff McClard, Sr. Director of National Accounts; Cam Bivens, Director of National Accounts; Brad Bradford, Director of National Accounts.

93.     At the National Pharmacy Forum, speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "upcoming patent cliffs" and "market trends."

94.     In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include social activities such as

theater performances, cocktail parties, and dinners, which allow Defendants' executives to interact with their competitors privately and outside the traditional business setting.

95.     As a result of their involvement in trade associations such as the GPhA, NACDS, MMCAP, and Health Care Supply Chain Association, Defendants had ample opportunities to communicate, signal, and agree to raise the price of Propranolol.

**D.     Absent an Anticompetitive Conspiracy, Propranolol Price Increases Would Have Run Contrary to Each Defendant's Self-Interest**

96.     Because Propranolol is a commodity product, absent a cartel, it would be expected that any manufacturer who raised the price of the drug would lose customers to manufacturers who did not raise prices.  As a result, it would not be in any manufacturer's self-interest to raise the price of Propranolol unless an agreement existed with other manufacturers to raise prices.

97.     During the Class Periods, the costs of manufacturing Propranolol remained stable, as did supply and demand.  And yet, each Defendant raised the prices of Propranolol by extraordinary margins. Absent the existence of a cartel, such price increases would have not been in each Defendant's self-interest.

**E.     Current Federal and State Antitrust Actions Regarding Anticompetitive Practices in the Generic Pharmaceutical Industry**

98.     Recent drastic price increases in the generic pharmaceutical industry have triggered several governmental investigations by federal and state antitrust regulators. Multiple congressional investigations were also launched.

99.     According to a December 2015 report prepared by the Office of Inspector General for the United States Department of Health and Human Services, the price of nearly one in four of the top 200 generic drugs rose faster than the price of inflation between 2005 and 2014.

100.    In April 2015, the Department of Health and Human Services Inspector General undertook an investigation into the sudden price increases implemented by generic drug manufacturers.

101.    In 2014 testimony before the Subcommittee on Primary Health and Aging, pharmaceutical industry experts testified that generic drug prices were not following traditional pricing patterns and were instead experiencing very substantial increases.

102.    An August 2016 Government Accountability Office report to members of Congress found that more than 300 generic drugs under Medicare Part D experienced "extraordinary" price increases of more than one hundred percent, and that the prices for most of these medicines remained excessively high for at least a year.

103.    Over the past year the DOJ's Antitrust Division has issued subpoenas to a number of generic drug manufacturers including Defendants Actavis, Par, Mylan and Teva. Mylan, in particular, noted in a November 9, 2016 regulatory filing that it received a subpoena from the DOJ related to the pricing and sale of Propranolol and its communications with competitors.

104.    In addition, two former executives of Defendant Heritage have been accused by the Justice Department of colluding to fix prices.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).  The executives, Jeffrey Glazer and Jason Malek, reportedly discussed selling Propranolol at a "high price" in early 2015, which is when the extraordinary price increases for Propranolol tables—the Propranolol product which Heritages sells—began. *See Heritage Pharmaceuticals Inc. v. Jeffrey A. Glazer and Jason T. Malek*, Case No. 16-cv-08483 (D.N.J. Nov. 11, 2016), app. A, n. 95.

105.    The Connecticut Attorney General has led its own investigation, which resulted in a 20-state complaint charging Defendants Mylan, Teva, and Heritage, and non-Defendants Aurobindo Pharma USA Inc. and Citron Pharma, LLC, with antitrust violations in the markets for Doxycycline Hyclate Delayed Release and Glyburide.  The complaint states that the "the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." In addition, the complaint lays out Mylan's role in both conspiracies and Mylan's regular communications with other competitors to fix prices as early as 2013.

## VII.    **MARKET DEFINITION**

106.    Plaintiff need not define a relevant market in connection with its Sherman Act and parallel state law claims because the anticompetitive conduct alleged herein is unlawful per se. The concerted horizontal restraints detailed above elevated the price of Propranolol tablets and Propranolol capsules far above competitive levels. Defendants' anticompetitive contract, combination, or conspiracy constitutes per se violations of the antitrust laws.

107.    To the extent a market definition may be relevant to Plaintiff's claims or allegations, the market affected by Defendants' unlawful restraints is the market for Propranolol capsules and Propranolol tablets in the United States and its territories.  Pursuant to their agreement, Defendants eliminated or substantially reduced competition in this market and inflated prices in this market.  During the Class period, Defendants were able to profitably maintain the U.S. prices of Propranolol capsules and Propranolol tablets at supracompetitive levels.

## VIII.   EFFECTS ON COMPETITION, AND DAMAGES

108.   Defendants' combination and conspiracy as set forth in this complaint has had the following effects, among others:

- Competition in the market for Propranolol capsules and tablets has been substantially reduced;

- Prices for Propranolol capsules and tablets have increased, and run contrary to the typical pricing patterns of generic drugs;

- United States purchasers have been deprived of the benefit of free and open price competition in the market for Propranolol capsules and tablets; and

- As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they paid artificially inflated prices for Propranolol capsules and tablets during the Class period.

109.   Plaintiff and the Class have been damaged as measured by the full amount of the overcharges that they paid in an amount subject to proof and to be determined at trial.

110.   The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## IX.   ANTITRUST IMPACT

111.   Supracompetitive prices upstream in the chain of distribution ordinarily result in higher prices at every level below.  That is true here as well.

112.   The overcharges resulting from defendants' conduct are directly traceable through the pharmaceutical distribution chain to end-payors.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts.  Wholesalers then sell the drug to pharmacies, which sell the drugs to consumers.

113.   In this small chain of distribution, drugs products are not altered or incorporated into other products.  And unlike other industries, each drug purchase is documented and closely

tracked by pharmacies, pharmacy benefit managers, and other entities.  The products—and their

price—are thus directly traceable from the manufacturer until they reach the hands of the

consumer at a pharmacy.

114.    Defendants' price increases directly impact both consumer and third-party payor

class members.  When a consumer purchases a drug at a pharmacy, the amount of the price paid

by the consumer and the amount paid by a third-party payor (such as health and welfare funds)

are determined according the consumers' prescription drug plan.  In many transactions, the

consumer will pay a percentage of the cost of the drug (*e.g.* 10% or 20%), with the third-party

payor paying the remainder of the cost.  As a result, when the price of a drug increases, the

increase is borne by both the consumer and third-party payor.  As the GAO Report explained,

"[g]eneric drugs not only lower costs for individuals in the form of lower copayments and other

out-of-pocket costs, but they also lower costs for third-party payers—including private health

insurance plans and public programs."

115.    Defendants' anticompetitive conduct has thus resulted in both consumers and

third-party payors purchasing Propranolol at prices that exceeded the prices defendants would

have been able to charge absent their anticompetitive conduct.

116.    Defendants continue to charge supracompetitive prices for their Propranolol

products.  But-for Defendants' price increases and maintenance of supracompetitive prices, they

would have priced their Propranolol products substantially lower than they did.

## X.    CLASS ACTION ALLEGATIONS

117.    Plaintiff brings this action on behalf of itself and, under Federal Rules of Civil

Procedure 23(a), (b)(1), (b)(2), and (b)(3), as a representative of a Class defined as follows:

All persons or entities:

(1) In the United States and its territories who, in the following jurisdictions—Alabama, Arizona, California, the District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin—indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for (a) Propranolol capsules or (b) Propranolol manufactured by Defendants and/or their affiliates, and/or

(2) Who reside in Alabama, Arizona, California, the District of Columbia, Florida, Guam, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin and indirectly purchased, paid and/or provided reimbursement in the United States or its territories for some or all of the purchase price for (a) Propranolol capsules or (b) Propranolol tablets which were manufactured by Defendants and/or their affiliates

for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class"), other than for resale between (i) February 20, 2013 and present for Propranolol capsules; and (ii) February 9, 2015 and present for Propranolol tablets.

118.   The following persons or entities are excluded from the Class:

- Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

- All federal or state governmental entities, excluding cities, towns, or municipalities with self-funded prescription drug plans;

- All persons or entities who purchased Propranolol for purposes of resale directly from Defendants and their affiliates;

- Fully insured health plans, *i.e*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;

- Any "flat co-pay" consumers whose purchases were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

- Pharmacy Benefits Managers; and

- All judges assigned to this case and any members of their immediate families.

119.    The Class members are so numerous that joinder is impracticable.  Members of the Class are widely dispersed throughout the country.  The Class includes at least hundreds of thousands of consumers and at least thousands of third-party payors.

120.    Plaintiff's claims are typical of the claims of all Class members.  Plaintiff and all Class members were damaged by the same wrongful conduct by Defendants, *i.e.*, they paid artificially inflated prices for Propranolol, and were deprived of the benefits of competition because of Defendants' wrongful conduct.

121.    Plaintiff will fairly and adequately protect and represent the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

122.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and who have particular expertise with class action antitrust litigation in the pharmaceutical industry.

123.    Questions of law and fact common to the Class members predominate over any questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.

124.    Questions of law and fact common to the Class include:

- whether Defendants violated sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3;

- whether Defendants' combination, conspiracy, or agreement constitutes a violation of the state laws set forth below;

- whether Defendants conspired to and did suppress competition in the market for Propranolol;

- whether Defendants' challenged conduct harmed competition in the Propranolol market;

- whether, and to what extent, Defendants' conduct as alleged herein caused antitrust injury to the business or property of Plaintiff and Class members in the form of overcharges;

- the quantum of aggregate overcharge damages paid by the class; and

- whether Plaintiff and Class members are entitled to injunctive relief to prevent further violation of sections 1 and 3 of the Sherman Act.

125.    Class treatment is a superior method for the fair and efficient adjudication of the controversy. Class treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

126.    Class treatment also is appropriate under Rule 23(b)(1) and/or (b)(2) because:

- the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants;

- the prosecution of separate actions by individual Class members would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other Class members not parties to such adjudications or would substantially impair or impede other Class members' ability to protect their interests; and

- Defendants have acted and refused to act on grounds that apply generally to the Class such that final injunctive relief and/or declaratory relief is warranted with respect to the Class as a whole.

127.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

34

XI.     **CLAIMS FOR RELIEF**

**CLAIM I**
**Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Asserted against all Defendants)**

128.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

129.    This claim is pled as to all Defendants.

130.    Beginning at least as early as (i) February 20, 2013 for Propranolol capsules; and (ii) February 9, 2015 for Propranolol tablets, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially eliminating or reducing competition in the pricing of Propranolol in the United States.

131.    Defendants combined and conspired to raise, fix, maintain or stabilize the prices of Propranolol in the United States during the Class period.

132.    As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for Propranolol sold to purchasers in the United States during the Class period were raised, fixed, maintained or stabilized at artificially inflated levels.

133.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

134.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of Propranolol.

Such activities included: (a) participating in meetings to discuss their respective Propranolol prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of Propranolol in a manner that deprived United States purchasers of free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' Propranolol.

135.    Defendants' concerted anticompetitive acts are illegal per se.

136.    As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they have paid more for the Propranolol that they purchased during the Class period than they otherwise would have paid absent Defendants' wrongful conduct.

137.    By reason of the foregoing, Plaintiff and the Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**CLAIM II**
**Violations of Section 3 of the Sherman Act, 15 U.S.C. § 3**
**(Asserted against all Defendants)**

138.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

139.    This claim is pled as to all Defendants.

140.    Beginning at least as early as (i) February 20, 2013 for Propranolol capsules; and (ii) February 9, 2015 for Propranolol tablets, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of section 3 of the Sherman Act, 15 U.S.C. § 3, by artificially eliminating or reducing

36

competition for the pricing of Propranolol in any state or territory of the United States or in the District of Columbia.

141. Defendants combined and conspired to raise, fix, maintain or stabilize the prices of Propranolol in any state or territory of the United States or in the District of Columbia during the Class period.

142. As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their horizontal price-fixing conspiracy, prices for Propranolol sold to purchasers in any state or territory of the United States or in the District of Columbia during the Class period were raised, fixed, maintained or stabilized at artificially inflated levels.

143. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

144. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain, and/or stabilize the prices of Propranolol. Such activities included: (a) participating in meetings to discuss their respective Propranolol prices and how they could coordinate their market behavior to restrain trade with regard to their generic drug products; (b) agreeing to coordinate and manipulate the prices and available supply of Propranolol in a manner that deprived United States purchasers of free and open price competition; and (c) providing pretextual justifications to purchasers and the public to explain the changes in the prices for Defendants' Propranolol.

145. Defendants' concerted anticompetitive acts are illegal per se.

146. As a direct and proximate result of Defendants' illegal anticompetitive conduct, Plaintiff and the Class of end-payors have been injured in their business and property in that they

have paid more for the Propranolol that they purchased during the Class period than they otherwise would have paid absent Defendants' wrongful conduct.

147.    By reason of the foregoing, Plaintiff and the Class are entitled to injunctive relief and a reasonable attorney's fee pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

### CLAIM III
### Conspiracy and Combination in Restraint of Trade in Violation of State Laws
### (Asserted against all Defendants)

148.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

149.    This claim is pled as to all Defendants.

150.    Beginning at least as early as (i) February 20, 2013 for Propranolol capsules; and (ii) February 9, 2015 for Propranolol tablets, the exact dates being unknown to Plaintiff and the Class and exclusively within Defendants' knowledge, Defendants, acting in concert, entered into a continuing combination, conspiracy or agreement to unreasonably restrain trade and commerce in restraint of trade, the purpose and effect of which was to fix, raise, maintain or stabilize the price of Propranolol.

151.    Defendants implemented the terms of their combination, conspiracy, or agreement and achieved their intended purpose.  As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as set forth above.

152.    Defendants' unlawful horizontal combination, conspiracy or agreement harmed competition in the market for Propranolol.

153.    There was and is no legitimate or non-pretextual procompetitive justification for Defendants' coordinated price increases that outweigh their harmful effect.  Even if there were

some conceivable justification, the coordinated price increases were not necessary to achieve that purpose.

154.    By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:

- Ariz. Rev. Stat. § 44-1402, *et seq.*, with respect to purchases in Arizona by Class members and/or purchases by Arizona residents.

- Cal. Bus. & Prof. Code § 16720, *et seq.*, with respect to purchases in California by Class members and/or purchases by California residents.

- D.C. Code § 28-4501, *et seq.*, with respect to purchases in the District of Columbia by Class members and/or purchases by District of Columbia residents.

- Fla. Stat. § 501.201, *et seq.*, with respect to purchases in Florida by Class members and/or purchases by Florida residents.

- Haw. Rev. Stat. § 480-1, *et seq.*, with respect to purchases in Hawaii by Class members and/or purchases by Hawaii residents.

- Iowa Code § 553.1, *et seq.*, with respect to purchases in Iowa by Class members and/or purchases by Iowa residents.

- Kan. Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas by Class members and/or purchases by Kansas residents.

- Me. Rev. Stat. Ann. 10 § 1101, *et seq.*, with respect to purchases in Maine by Class members and/or purchases by Maine residents.

- Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by Class members and/or purchases by Massachusetts end-payors paying substantially higher prices for Propranolol in actions and transactions occurring substantially within Massachusetts.

- Mich. Comp. Laws § 445.771, *et seq.*, with respect to purchases in Michigan by Class members and/or purchases by Michigan residents.

- Minn. Stat. § 325D.51, *et seq.*, with respect to purchases in Minnesota by Class members and/or purchases by Minnesota residents.

- Miss. Code § 75-21-1, *et seq.*, with respect to purchases in Mississippi by Class members and/or purchases by Mississippi residents.

- Neb. Rev. Stat. § 59-801, *et seq.*, with respect to purchases in Nebraska by Class members and/or purchases by Nebraska residents.

- Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by Class members and/or purchases by Nevada residents, in that thousands of sales of Propranolol occurred at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

- N.H. Rev. Stat. Ann. § 356:2, *et seq.*, with respect to purchases in New Hampshire by Class members and/or purchases by New Hampshire residents.

- N.M. Stat. Ann. § 57-1-1, *et seq.*, with respect to purchases in New Mexico by Class members and/or purchases by New Mexico residents.

- New York General Business Law § 340, *et seq.*, with respect to purchases in New York by Class members and/or purchases by New York residents.

- N.C. Gen. Stat. § 75-1, *et seq.*, with respect to purchases in North Carolina by Class members and/or purchases by North Carolina residents.

- N.D. Cent. Code § 51-08.1-02, *et seq.*, with respect to purchases in North Carolina by Class members and/or purchases by North Dakota residents.

- S.D. Codified Laws Ann. § 37-1-3.1, *et seq.*, with respect to purchases in South Dakota by Class members and/or purchases by South Dakota residents.

- Tenn. Code Ann. § 47-25-101, *et seq.*, with respect to purchases in Tennessee by Class members and/or purchases by Tennessee residents, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Propranolol at Tennessee pharmacies.

- W. Va. Code § 47-18-3, *et seq.*, with respect to purchases in West Virginia by Class members and/or purchases by West Virginia residents.

- Wis. Stat. § 133.03, *et seq.*, with respect to purchases of Propranolol in Wisconsin by Class members and/or purchases by Wisconsin residents, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher prices for Propranolol at Wisconsin pharmacies.

155.    Plaintiff and Class members have been and will continue to be injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiff and Class members (i) were denied the opportunity to purchase more affordable

Propranolol, and (ii) paid higher prices for Propranolol than they would have paid but for

Defendants' unlawful conduct.  Such injuries are of the type that the aforementioned laws were

intended to prevent and flow from that which makes Defendants' acts unlawful.

156.    Plaintiff and the Class are entitled to actual and trebled damages as permitted by
law.

**CLAIM IV**
**Violations of State Consumer Protection Statutes**
**(Asserted against all Defendants)**

157.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

158.    This claim is pled as to all Defendants.

159.    Beginning at least as early as (i) February 20, 2013 for Propranolol capsules; and

(ii) February 9, 2015 for Propranolol tablets, the exact dates being unknown to Plaintiff and the

Class and exclusively within Defendants' knowledge, Defendants, acting in concert, engaged in

unfair methods of competition, and unfair and unconscionable acts or practices in the course of

trade, with respect to the sale of Propranolol in violation of the following state consumer

protection and unfair competition statutes:

- Cal. Bus. & Prof. Code § 17200, *et seq.*;

- D.C. Code Ann. § 28-3901, *et seq.*;

- Fla. Stat. § 501.201, *et seq.*;

- Haw. Rev. Stat. § 480-2, *et seq.*;

- Kan. Stat. Ann. § 50-623, *et seq.*;

- Mass. Gen. Laws chapter 93A § 1, *et seq.*;

- Mich. Comp. Laws § 445.901, *et seq.*;

- Miss. Code § 75-24-1, *et seq.*;

- Neb. Rev. Stat. § 59-1601, *et seq.*;

- N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*;

- N.M. Stat. Ann. § 57-12-1, *et seq.*;

- N.C. Gen. Stat. § 75-1.1, *et seq.*; and

- Rhode Island Gen. Laws § 6-13.1-1, *et seq.*

160.    Defendants agreed to, and did, act unfairly in restraint of commerce by affecting, fixing, controlling and/or maintaining, at artificial and supracompetitive levels, the prices at which Propranolol was sold, distributed, or obtained and made efforts to conceal their agreements from Plaintiff and the Class.

161.    Defendants' intentional anticompetitive acts, described above, were intended to and did cause Plaintiff and/or Class members to pay supracompetitive prices for Propranolol in the states listed above.

162.    All of Defendants' unlawful and unfair conduct occurred in the course of their business and was part of a generalized course of conduct.

163.    As a direct and proximate result of the Defendants' unfair methods of competition and unfair and unconscionable trade practices, Plaintiff and the Class have been injured in their business and property in that they paid more for Propranolol than they otherwise would have paid in the absence of Defendants' unlawful and unfair conduct.

164.    Plaintiff and the Class are therefore entitled to appropriate relief as provided for by the laws of the states set forth above, including but not limited to damages, injunctive relief, reasonable attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits Defendants obtained by reason of their unlawful and unfair conduct.

XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that the Court:

A.   Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and designate the Plaintiff as the representative of the Class;

B.   Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

C.   Award the Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

D.   Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and establishment of a constructive trust to remedy Defendants' illegal conduct, including:

    i.   A judicial determination declaring the rights of Plaintiff and Class members and the corresponding responsibilities of Defendants;

    ii.   A declaration that Defendants are to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

    iii.   Disgorgement and/or the imposition of a constructive trust upon Defendants' ill-gotten gains, thereby freezing Defendants' assets, and/or requiring Defendants to pay restitution to Plaintiff and Class members of all funds acquired by means of any act or practice declared by this Court to violate federal or state statutes or to constitute unfair methods of competition or unfair or unconscionable acts or practices in the course of trade.

E.      Award Plaintiff and the Class their costs of suit, including reasonable attorneys'

fees as provided for by law.

XIII. **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the Class,

demands a trial by jury on all issues so triable.


Dated: February 10, 2017                 Respectfully Submitted

                                         **SAFIRSTEIN METCALF LLP**

                                         By:  ___/s Peter Safirstein___

                                         Peter Safirstein
                                         1250 Broadway, 27th Floor
                                         New York, NY 10001
                                         Telephone:  (212) 201-2845
                                         Email: psafirstein@safirsteinmetcalf.com

                                         **GIRARD GIBBS LLP**
                                         Daniel C. Girard (*pro hac pending*)
                                         Dena C. Sharp (*pro hac pending*)
                                         Scott M. Grzenczyk (*pro hac pending*)
                                         Adam E. Polk (*pro hac pending*)

                                         711 Third Ave, 20th Floor
                                         New York, New York 10017
                                         Telephone:  (212)798-0136
                                         Facsimile:  (212)557-2952
                                         Email: dcg@girardgibbs.com
                                         Email: je@girardgibbs.com
                                         Email: smg@girardgibbs.com
                                         Email: aep@girardgibbs.com

                                         601 California Street, Suite 1400
                                         San Francisco, CA 94108
                                         Telephone:  (415) 981-4800
                                         Facsimile:  (415) 981-4846

                                         *Attorneys for Plaintiff*